**EDGEWATER HEALTH CARE, INC., Plaintiff/Appellant/Cross–Respondent,**

v.

**HEALTH SYSTEMS MANAGEMENT, INC. and Homar Enterprises, Inc., Defendants/Respondents/Cross–Appellants.**

Nos. 53128, 53188.

Missouri Court of Appeals, Eastern District, Division Four.

April 26, 1988.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 25, 1988.

Application to Transfer Denied July 26, 1988.

Craig A. Sullivan, St. Louis, for plaintiff/appellant/cross-respondent.

Gregory H. Wolk, James M. Wasserman, Tockman, Schraeder & Wolk, St. Louis, for defendants/respondents/cross-appellants.

SIMON, Presiding Judge.

This appeal arises out of an action in the Circuit Court of St. Louis County by plaintiff, Edgewater Health Care, Inc. (Edgewater), seeking past due rental payments and reimbursement of real property taxes, plus interest, from defendants, Health Systems Management, Inc., and its assignee, Homar Enterprises, Inc. (hereinafter collectively referred to as H.S.M.). H.S.M. filed a counterclaim for breach of contract seeking reimbursement of certain maintenance expenditures. At the close of all evidence, the trial court directed a verdict for Edgewater in the amount of $1,404.00 for the past due rental payments. The jury awarded Edgewater $21,281.45 for reimbursement of the real property taxes. The judge awarded prejudgment interest to Edgewater amounting to $5,092.98. The jury awarded H.S.M. $38,184.33 on its counterclaim for reimbursement of expenditures. No prejudgment interest was awarded to H.S.M. The verdicts were offset against each other entitling H.S.M. to recover $10,-405.90. Edgewater appeals the judgment on the directed verdict and H.S.M. cross-appeals on the real property taxes judgment and the trial court's failure to grant prejudgment interest on the reimbursement of expenditures judgment.

Specifically, Edgewater raises three points, all of which essentially contend that

the language in paragraphs 3 and 7 of the lease is ambiguous and that the trial court erred in not allowing other evidence to establish the intent of the parties. In its cross-appeal, H.S.M. raises five points: (1) that Edgewater failed to make a submissible case in its claim for reimbursement of real property taxes; (2) that the trial judge erred in submitting Instruction Number 7, a verdict director patterned after MAI 26.-06, without an additional "separate factors" instruction; (3) that the trial court erred in not giving the jury specific directions to disregard testimony of James Daake regarding settlement negotiations; (4) that the trial court erred in not submitting H.S.M.'s instructions on its affirmative defense of accord and satisfaction; and, (5) that the trial court erred in not granting prejudgment interest on the reimbursement of expenditures judgment.

The facts in the light most favorable to the verdicts are as follows: Edgewater is the owner of Chesterfield Manor, a nursing home in St. Louis County. The parties entered into protracted negotiations to lease the nursing home. Both parties submitted drafts of a proposed lease prior to the final draft. The record does not indicate which party submitted its draft first or which party prepared the final draft that was executed by the parties on June 1, 1980. The term of the lease was divided into an initial term of three years, from July 1, 1980, to June 30, 1983, with six three year options. The pertinent provisions of the lease covering the monthly lease payment and the option to extend the lease are as follows:

3. OPTION TO EXTEND LEASE.

LESSORS [Edgewater] hereby grant to LESSEE [Health Systems Management, Inc.] or their assignees [Homar Enterprises, Inc.] an option to extend the LEASE for six (6) additional three (3) year periods. The consideration for the exercise of this extension shall be that the Eight Thousand Five Hundred Dollar ($8,500.00) base amount as explained in paragraph 7 shall be increased or de-

creased by the average percent of increase or decrease of the last three (3) year period of the consumer price index. All other considerations will stay the same.

This option shall be exercised, if so desired, by LESSEES' written notice to LESSORS not less than three (3) months prior to the effective date of each extension.

\* \* \* \* \* \*

7. The LESSEES shall make monthly payments of Eight Thousand Five Hundred Dollars ($8,500.00) on the tenth (10) of each month starting with the first month and continuing for the period of the LEASE, additional payment will be required at the end of each month based on the occupancy for the preceding month, this amount will be determined as follows: the total number of occupied bed days for the month will be added and then divided by the number of days in the month, based on this figure, for every resident over one hundred (100), Three Hundred Dollars ($300.00) will be paid. However, in no event will the additional payment referred to above in excess of the base rent of $8,500.00 per month exceed $17,000.00 per month and furthermore in no event will the additional monthly payment be less than the amount of the next preceding month. In any event, the LESSEES agree to pay the maximum of $17,000.00 per month commencing no later than the nineteenth (19) month of the LEASE ...

The dispute giving rise to Edgewater's claim concerns the determination of the monthly lease payments during the option periods.

At the expiration of the initial three year lease period, the parties sought to determine the amount of the new monthly lease payment. Edgewater calculated the new monthly payment to be $20,750 and H.S.M.'s calculations yielded a figure of $17,590 per month. The difference in these figures occurred as a result of varying interpretations of paragraph 3 and paragraph 7 of

the lease. Edgewater maintains that the phrase "base amount as explained in paragraph 7" in paragraph 3 equates to $17,000, and not $8,500 as H.S.M. claims. Furthermore, Edgewater argues that the sum of the percentage changes in the consumer price index for the previous three year period ought to be utilized as the multiplier pursuant to paragraph 3, while H.S.M. contends the average percentage change, or one third, of the total percentage change in the consumer price index during the three year period is the appropriate multiplier.

Prior to trial, Edgewater made an extensive offer of proof with regard to parol evidence concerning paragraphs 3 and 7. The trial judge sustained H.S.M.'s motion in limine requesting the exclusion of the parol evidence and ruled as a matter of law that the language in the two paragraphs is unambiguous. Therefore, the trial court directed a verdict for Edgewater in the amount of $1,404.00 at the close of all the evidence. This amount was stipulated by the parties as being the amount H.S.M. underpaid rent during the previous three year period if the trial court found in H.S.M.'s favor in the interpretation of paragraphs 3 and 7.

H.S.M.'s cross-appeal concerns the breach of lease claim by Edgewater regarding the real property taxes. The property is described as the "Demised Premises" in the lease. In its first paragraph, the lease refers to "Schedule A," which describes the "Demised Premises." Paragraph 25 of the lease, entitled *"The Leased Premises,"* states in pertinent part:

1. The LEASE referred to herein refers to the actual parcel leased which includes all of the improvements and buildings and ground area located within the asphalt drive and parking area shown on a survey of said premises marked Exhibit ___ attached hereto together with a fifty (50) foot wide strip of ground adjoining the outer edges of the asphalt drive and parking area.

The Exhibit blank (presumably "A" as in "Schedule A" referred to previously in the lease) was not filled in. Furthermore, neither Schedule A nor Exhibit ___ were attached to the lease.

Edgewater owns a tract of real estate totaling 28 to 30 acres. It is undisputed that the Demised Premises includes the nursing home plant on seven of those acres. This is the only portion of the total acreage with improvements thereon. Edgewater never subdivided the property and the real property tax assessments and tax bills were for the entire 28 to 30 acres.

When the lease was prepared and ready for signing, a discussion ensued between Dr. John Daake for Edgewater and Darrell Hoefling, vice-president of H.S.M., relative to the real property taxes. The typewritten lease did not contain a provision for real estate taxes. Following discussion of the subject, Mr. Hoefling wrote into the lease by interlineation the following: "Lesees [sic] agree to pay ½ of the real estate taxes when they become due to be held in reserve monthly." Since the handwritten clause did not specify whether H.S.M. should pay one half of the real property taxes for the demised premises or one half of the taxes on the entire plot of land, the trial court found the clause to be ambiguous and allowed additional evidence to ascertain the intent of the parties.

In October, 1980, Tom Eggers of Edgewater billed H.S.M. for one half of the 1980 real estate taxes. In November, 1980, Mr. Hoefling wrote Mr. Eggers a letter pointing out that H.S.M. had only been in possession of the leased premises for one half of 1980. Furthermore, Mr. Hoefling asserted that Edgewater never supplied a survey of the Demised Premises to H.S.M. The survey referred to by Mr. Hoefling is the aforementioned Schedule A or Exhibit ___. Apparently, H.S.M. sought to pay its share of taxes only on the demised premises and not on the entire tract. Mr. Hoefling concluded his letter by stating, "it appears to us that we will have to discuss further and reach an understanding of what taxes we are obligated to pay on the leased premises only and not the tract as a whole."

James Daake, Edgewater's vice-president, testified that early in 1981, he and Mr. Hoefling met to discuss the 1980 real property tax bill. Mr. Daake testified that he told Mr. Hoefling that H.S.M. should pay "one half of one half" of the entire bill for 1980. Thereafter, H.S.M. paid one eighth of the total amount of the tax bill. In 1981 and 1982, Tom Eggers made a bookkeeping error by which he billed one fourth of the entire real property tax to H.S.M. This error apparently arose out of the calculation of the 1980 real property taxes as being one fourth of the taxes for one half of the year. In 1981, Tom Eggers referred to the previous year's records and billed the same fraction.

In May, 1983, Dr. Daake informed James Daake that H.S.M. is obligated, under the lease, to pay one half of the real property tax bills on the entire tract. James Daake sent a letter to H.S.M. in July, 1983, informing H.S.M. of its obligation under the lease to pay one half of the real property taxes. H.S.M. thereafter paid only one fourth of the real property taxes. Edgewater nevertheless accepted H.S.M.'s check and deposited it in its account.

H.S.M.'s counterclaim sought reimbursement for various expenses relating to the maintenance of the demised premises. The jury returned a verdict for H.S.M. in the amount of $38,184.33, which was less than what had been prayed for. The trial court did not award prejudgment interest to H.S.M.

In its three points on appeal, Edgewater claims the trial court erred in finding the phrase in paragraph 3, "Eight Thousand Five Hundred Dollar ($8,500.00) base amount as explained in paragraph 7," unambiguous. Furthermore, Edgewater disputes the trial court's finding that the phrase in paragraph 3, "shall be increased or decreased by the average percent of the increase or decrease of the last three (3) year period," is unambiguous. Edgewater did not appeal the judgment in favor of H.S.M. for reimbursement of expenditures.

 The cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention. Where there is no ambiguity in the contract the intention of the parties is to be gathered from it and it alone, and it becomes the duty of the court and not the jury to state its clear meaning. *Kalen v. Steele*, 341 S.W.2d 343, 346[1, 2] (Mo.App.1960). Of course, whether the terms of an agreement are ambiguous is a question of law. If it is determined that an ambiguity exists, it is then for the trier of fact to resolve the ambiguity. *Mal Spinrad of St. Louis, Inc. v. Karman, Inc.*, 690 S.W.2d 460, 464[7] (Mo.App.1985).

 An ambiguity is said to exist in a written instrument "only when it is reasonably susceptible of different constructions." *Kalen*, 341 S.W.2d at 346–47[4]. In determining whether vel non an ambiguity exists, the whole instrument must be considered. When an ambiguity exists in a contract, the interpretation given to the contract by the parties, as shown by their conduct, may be considered in determining their true intent. *O'Brien v. Missouri Cities Water Co.*, 574 S.W.2d 13, 19[4] (Mo. App.1978). A contract is not rendered ambiguous by the fact that the parties do not agree upon the proper construction to be given it. *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264[5] (Mo. banc 1973).

 Here, the trial court ruled as a matter of law that the language in paragraphs 3 and 7 is unambiguous. Although the language in question is not favorable to Edgewater, we conclude that the language is unambiguous. Thus, the trial court properly excluded evidence of the intent of the parties relating to paragraphs 3 and 7. Edgewater's three points are not meritorious.

In the first point in its cross-appeal, H.S.M. contends that Edgewater failed to make a submissible case in Edgewater's claim for reimbursement of the real property taxes because: (1) Edgewater never obtained a survey of the demised premises which was to be known as Schedule A or Exhibit __;

(2) Edgewater never obtained a tax assessment of the demised premises separate from the entire tract; and, (3) Edgewater never demanded from H.S.M. a sum equal to one half of the real estate taxes due on the demised premises alone. As such, H.S.M. argues that Edgewater is precluded from seeking damages for breach of contract as Edgewater has failed to establish performance of its own obligations under the contract.

■ Where the language of the contract on its face is not clear or is ambiguous, and resort to extrinsic evidence is necessary, if such evidence be conflicting, or, if not conflicting, different conclusions might reasonably be drawn therefrom, the construction of the agreement is for the jury under proper instructions from the trial court. *Commerce Trust Company v. Howard,* 429 S.W.2d 702, 705[2] (Mo.1968).

■ It is uncontroverted that the lease is silent as to which party had the duty to obtain the survey of the demised premises. H.S.M. argues that Edgewater was required to get the survey while Edgewater claims it had no such duty. Both parties, however, signed the lease without Schedule A or Exhibit ___ being attached. Furthermore, the lone clause in the lease referring to real property taxes is the aforementioned handwritten clause, "Lesees [sic] agree to pay ½ of the real estate taxes when they become due to be held in reserve monthly." The trial court allowed extrinsic evidence which enabled the jury to determine the intent of the parties regarding these issues. Pursuant to the trial court's instructions, the jury found that Edgewater had performed its agreement under the lease regarding the real property taxes. The record reflects competent evidence to support the submission. Point denied.

Next, H.S.M. contends that the trial court erred in submitting Instruction Number 7, a verdict director patterned after MAI 26.06 [1981 Revision], which states as follows:

Your verdict must be for plaintiff if you believe:

First, plaintiff and defendants entered into a lease agreement whereby plaintiff agreed to lease Chesterfield Manor to defendants and defendants agreed to pay one half (½) of the amount contained in the tax bill issued to plaintiff by the St. Louis County Collector as real property taxes on Chesterfield Manor improvements and all surrounding land owned by plaintiff, and

Second, plaintiff performed its agreement, and

Third, defendants failed to perform their agreement, and

Fourth, plaintiff was thereby damaged.

H.S.M. bases its contention on three separate arguments: (1) that the language of the contract is unambiguous and the submission of the instruction is not required; (2) that the instruction was not supported by the evidence; and, (3) that *Busch and Latta Printing Corp. v. State Highway Commission,* 597 S.W.2d 189 (Mo.App. 1980), requires instructions patterned after MAI 26.06 to include a separate instruction as to the factors to be considered in determining the meaning of the contract.

We have already discussed the ambiguity surrounding the handwritten clause, "Lesees [sic] agree to pay ½ of the real estate taxes when they become due to be held in reserve monthly," in that it is unclear whether H.S.M. is required to pay real property taxes only on the demised premises or on the entire tract. Furthermore, we previously found competent evidence in the record to support the submission of the instruction. Disposition of H.S.M.'s remaining argument, however, requires further discussion.

■ If a Missouri Approved Instruction is applicable, such instruction must be given to the exclusion of all others. *Karashin v. Haggard Hauling & Rigging, Inc.,* 653 S.W.2d 203, 206[7] (Mo. banc 1983). Missouri Approved Instruction 26.-06 [1981 Revision]—Breach of Bilateral Contract—Terms and Breach in Issue is to be given in bilateral contract cases where

terms and breach are in issue. The court in *Busch & Latta, supra,* was interpreting MAI 26.06 prior to the 1981 revision of the instruction. Presumably, MAI 26.06 [1981 Revision] takes into account the *Busch & Latta* decision and does not require an additional "factors instruction." The trial court did not err in submitting Instruction Number 7. Point denied.

■ The third point in H.S.M.'s cross-appeal involves certain testimony of James Daake. On direct examination, Mr. Daake was asked about a conversation that he had with Larry VanderMaten, H.S.M.'s president, in August, 1983, concerning real property taxes. Counsel for H.S.M. duly objected to the question on the grounds that the answer related to parol evidence arising after the contract was formed, and also that the answer would possibly involve settlement negotiations. The objection was overruled. Mr. Daake answered, "[Mr. VanderMater] said that there was enough credence or the language was such that it offered validity to an argument that we were proposing. Therefore, he would agree to pay one half of the real estate taxes." Thereafter, the following transpired:

MR. WOLK [counsel for H.S.M.]: Your Honor, at this point may I approach the Bench?

(Proceedings at the Side Bar Bench, out of the hearing of the jury and the witness:)

MR. WOLK: Your Honor, pursuant to my objection before we began I think the witness has now indicated these were setup negotiations. He testified that it had to do with a manner of resolving the meeting [sic] of the Lease. It's highly prejudicial, highly immaterial, and it seems to us we are entitled to at least the direction, a very strong direction. The jury is not to consider that and I may—well, at this point I will not ask you to strike.

THE COURT: You won't ask me to strike?

MR. WOLK: At this point.

THE COURT: Mr. Sullivan, how do you feel about it?

MR. SULLIVAN [counsel for Edgewater]: I think it probably should be stricken the way it came out.

THE COURT: Okay.

MR. WOLK: Your Honor, would we be entitled to a direction?

THE COURT: Yes. I will tell the jury to disregard the answer.

MR. WOLK: Are we entitled to a direction as to settlement negotiations?

MR. SULLIVAN: No.

MR. WOLK: That it is not relevant or something in this case.

THE COURT: I am not going into any details, no.

(Before the jury:)

THE COURT: Jurors, I sustain the answer [sic] to the question and direct that you disregard it completely.

The trial court did not give further directions to the jury regarding the above exchange. H.S.M. claims the trial court erred in not giving the jury specific directions regarding the inadmissibility of settlement negotiations. H.S.M. is correct in its assertion that evidence of settlement negotiations is inadmissible. *J.A. Tobin Construction Co. v. State Highway Commission of Missouri,* 697 S.W.2d 183, 186[3] (Mo.App.1985).

Our research has uncovered three Missouri cases in which evidence of settlement negotiations was erroneously admitted by the trial court and what was done, or should have been done, to cure the error. *See, Kelsey v. Kelsey,* 329 S.W.2d 272, 274 (Mo.App.1959); *Schneider v. Dubinsky Realty Co.,* 344 Mo. 654, 127 S.W.2d 691, 696 (1939); and, *Rusher v. City of Aurora,* 71 Mo.App. 418, 424–25 (1897). None of the cases required a specific direction to the jury regarding the inadmissibility of the settlement negotiations.

Our review of the trial court's exercise of its discretion in determining the existence

of prejudicial effect in striking testimony is limited to the determination of whether there has been an abuse of discretion in finding prejudice. *Overtrop v. Bi–State Development Agency*, 521 S.W.2d 488, 492[4] (Mo.App.1975). Finding no abuse of discretion, H.S.M.'s third point is denied.

H.S.M.'s fourth point in its cross-appeal is based on the trial court's refusal to instruct the jury with H.S.M.'s tendered instructions A and C on the affirmative defense of accord and satisfaction.

■ In determining whether an instruction should have been given or withheld based on the evidence presented, we view the evidence in the light most favorable to the party offering the instruction giving that party the benefit of all favorable inferences and disregarding the contrary evidence. *Roque v. Kaw Transport Co.*, 697 S.W.2d 254, 257[10] (Mo.App.1985). Viewing the evidence in this light, Edgewater sent a bill to H.S.M. for one half of the 1980 real property taxes for the entire tract. H.S.M. responded with a letter indicating that it was not responsible for any taxes prior to July 1, 1980, and further indicating, "it appears to us that we will have to discuss further and reach an understanding of what taxes we are obligated to pay on the leased premises only and not the tract as a whole." Darrell Hoefling testified that in early 1981, he and James Daake agreed that H.S.M. would pay, "one half of one half" of the real property taxes on the entire tract. H.S.M. tendered payment for one eighth of the taxes, or one half of one half of one half, for 1980. In 1982 and 1983, Tom Eggers billed H.S.M. for one fourth of the real property taxes for 1981 and 1982 for the entire tract based on the proportion paid by H.S.M. for 1980. H.S.M. paid one fourth of the tax bills. Edgewater accepted and negotiated the checks. Edgewater billed H.S.M. for one half of the 1983 and 1984 real property taxes on the entire tract and H.S.M. paid one fourth of the taxes for those years.

H.S.M. contends that the evidence establishes the elements creating an accord and satisfaction. First of all, the debt is disputed in that H.S.M. contends that the "one half of one half" agreement extended throughout the term of the lease, while Edgewater maintains the "one half of one half" agreement was for the partial year of 1980 only. H.S.M. argues that the offer was communicated to Edgewater through the "one half of one half" agreement. Consideration is supplied by H.S.M.'s tender of the checks for one fourth of the real property taxes on the entire tract for one year, or a proportionate fraction thereof in regards to the half year of 1980. Edgewater manifested its acceptance to the accord by accepting all the checks for real property taxes and negotiating the checks, completing the satisfaction. Therefore, H.S.M. concludes the evidence supported the submissibility of the tendered instructions and the failure of the trial court to submit the instructions was prejudicial.

■ An accord is an agreement for the settlement of some previously existing claim by a substituted performance. *Bestor v. American National Stores, Inc.*, 691 S.W.2d 384, 388[2] (Mo.App.1985). Satisfaction is the performance of such agreement. *Schroeder v. Dy–Tronix, Inc.*, 723 S.W.2d 934, 936[1] (Mo.App.1987). The validity of such an agreement is dependent upon the same basic factors and principles that govern contracts generally, i.e., offer, acceptance and consideration. *Bestor*, 691 S.W.2d at 388, 389[3, 6]. Either a bona fide dispute or an unliquidated claim will support an accord and satisfaction. *Weinberg v. Globe Indemnity Co.*, 355 S.W.2d 341, 349[14] (Mo.App.1962). Furthermore, where the claim is unliquidated or in dispute, no additional consideration other than partial payment is necessary to support an accord and satisfaction. *Alaska Federal Savings & Loan Association v. Hoffman*, 485 S.W.2d 118, 123[3] (Mo.App.1972).

■ Therefore, viewing the evidence in the light most favorable to H.S.M., we conclude that the trial court erred in failing to submit instructions on H.S.M.'s affirmative defense. As a result, we must reverse that

portion of the judgment relating to the real estate taxes and remand for a new trial on that particular issue.

H.S.M.'s final point in the cross-appeal is that the trial court erred in not granting prejudgment interest on its claim for reimbursement of various maintenance expenditures. We note at the outset that H.S.M. failed to raise the interest issue in its motion for new trial and its motion for directed verdict which was incorporated by reference in its motion for new trial.

Complaints as to the allowance of interest, not raised in the motion for new trial, are not reviewable on appeal. Rule 78.07; *Modine Manufacturing Company v. Carlock,* 510 S.W.2d 462, 472[15] (Mo.1974). It is fundamental that a trial court must be given an opportunity to review and correct an error before we are called upon to review it. *Filmakers Releasing Organization v. Realart Pictures of St. Louis, Inc.,* 374 S.W.2d 535, 546[12] (Mo.App.1964). H.S.M.'s final point has not been preserved and we shall not review the contention.

Judgment is affirmed in part; reversed and remanded in part.

CRANDALL and GRIMM, JJ., concur.